FILED
2014 Oct-29  PM 02:11
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **MICKALE HOPKINS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-13-S-429-NE** |
| | ) | |
| **CITY OF HUNTSVILLE,** | ) | |
| **ALABAMA, CHARLES NIX,** | ) | |
| **and BRIAN SHOCKLEY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

The second amended complaint of plaintiff, Mickale Hopkins, asserts federal and supplemental state-law claims against two uniformed police officers for the City of Huntsville, Alabama:  Charles Nix and Brian Shockley.  Plaintiff alleges three federal claims for alleged violations of the Fourth Amendment under 42 U.S.C. § 1983 — *i.e.*, unlawful search and seizure (Count I), false imprisonment (Count II), and excessive force (Count III) — a fourth federal claim for conspiracy to violate plaintiff's civil rights, asserted under 42 U.S.C. §§ 1985(3) and 1986 (Count IV), and a fifth claim against the City of Huntsville, Alabama, the employer of both of the individual defendants, for all of the constitutional violations alleged in his second amended complaint (Count V).[1]  In addition, plaintiff alleges two supplemental state-

---

[1] Doc. no. 28 (Second Amended Complaint).

law claims against the individual defenants for assault and battery (Count VI), and false arrest and false imprisonment (Count VII).[2]

The case presently is before the court on defendants' motion for summary judgment on all of plaintiff's claims,[3] and defendants' motion to strike portions of the written report and deposition testimony of Dr. William Gaut, submitted by plaintiff as evidence in opposition to the motion for summary judgment.[4]  Upon consideration of the motions, pleadings, briefs, evidentiary submissions, and oral arguments of counsel, the court concludes that the both motions should be granted in part and denied in part.

## I. SUMMARY JUDGMENT STANDARDS

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

---

[2] Both plaintiff's claim for state law assault and battery and his claim for state law false arrest/false imprisonment were assigned the heading "Count VI."  *See id.* at 11-12.  The court assumes that was a typographical error, and plaintiff intended for the assault and battery claim to be Count VI, and for the false arrest/false imprisonment claim to be Count VII.

[3] Doc. no. 47.

[4] Doc. no. 58.

bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration supplied). *See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. DEFENDANTS' MOTION TO STRIKE

Plaintiff's proposed "expert witness," Dr. William Gaut, is a former police officer for the City of Birmingham, Alabama.  He held several positions during his twenty-four years with that department, including the Uniform Patrol Division, Police Academy Instructor, Detective Sergeant – Homicide Division, Lieutenant – Chief's Administrative Staff, Captain – Precinct Commander, and Captain of Detectives.  He also served as the Administrator/Director of the Special Services Division of the Jefferson County Attorney's Office from 1992-1994.  He taught Criminal Law, Homicide Investigation, Fundamentals of Criminal Investigation, and Fundamentals of Criminal Justice (Police Practices and Procedures) as an Adjunct Professor at Jefferson State Community College from 1997 to 1999.

Dr. Gaut holds an Associate's Degree in Law Enforcement from Jefferson State Community College, a Bachelor of Science Degree in Criminal Justice from the University of Alabama in Birmingham, a Masters Degree in Public and Private Management from Birmingham Southern College, and a Doctor of Philosophy in Criminal Justice from Northcentral University (a private, for-profit, but accredited university established in 1996 and offering degree coursework "online").[5]

Dr. Gaut offered the following opinions in the expert report required by Federal Rule of Civil Procedure 26(a)(2)(B), each of which was stated to "a reasonable degree

---

[5] Doc. no. 53-2 (Expert Report of William T. Gaut, Ph.D.), at ECF 16-18 (Curriculum Vitae). *See also* http://www.ncu.edu (last visited Sept. 30, 2014).

of professional certainty," and based on Dr. Gaut's "experience, documents reviewed, and industry standards," *i.e.*:

1. Defendants under color of office and without articulable reasonable suspicion or sufficient probable cause, improperly detained and subsequently arrested Mickale Hopkins.

2. Defendants improperly conducted a search and seizure of Mickale Hopkins' property.

3. Defendants, under color of office, used unreasonable and excessive force to detain Mickale Hopkins, which was a proximate cause of injury to Mickale Hopkins.

4. The City of Huntsville, Alabama, through the Huntsville Police Department[,] failed to properly train and supervise the defendant Huntsville Police Officers.

5. The failure of supervisors to take corrective actions of officers [*sic*] violations of written policy, [*sic*] rises to the level of deliberate indifference for the constitutional rights of Mickale Hopkins.[6]

Plaintiff relied upon Dr. Gaut's report, and his corroborating deposition testimony, to support the following *proposed* facts, stated in his opposition to defendants' motion for summary judgment:

96. The search of Plaintiff's vehicle by which officers found the BB gun and sweatshirt were performed without permission, without probable cause, and without a warrant. . . .

. . . .

---

[6] Doc. no. 53-2 (Expert Report of William T. Gaut, Ph.D.), at ECF 6 (alterations supplied).

112.   Officer Nix lacked reasonable suspicion to perform a *Terry* stop of Plaintiff. . . .

113.   Officer Nix lacked reasonable suspicion to perform a *Terry* frisk of Plaintiff. . . .

114.   The hooded sweatshirt found in Plaintiff's vehicle was not in plain view. . . .

. . . .

122.   The written policy of the Huntsville Police Department regarding racial bias and profiling is contradictory and vague, and does not give officers a clear directive as to acceptable or expected conduct. . . .

123.   Officers Nix and Shockley violated the policy of the Huntsville Police Department regarding racial bias and profiling. . . .[7]

Defendants assert that Dr. Gaut should not be permitted to offer his opinion regarding the constitutionality of the conduct of Officers Nix and Shockley, or of the City of Huntsville's policies.  This court agrees.  Analysis of the issue must begin with Federal Rule of Evidence 702, which provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) *the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;*

---

[7] Doc. no. 53 (plaintiff's summary judgment response brief) ¶¶ 96, 112-14, 122-23 (record citations omitted).

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (emphasis supplied).

Here, Dr. Gaut's opinions as to the constitutionality of the individual defendants' actions and the City's policies will not assist the trier of fact, because it is the role of the judge, and not an expert witness, to instruct the jury on the applicable principles of law.  As the Eleventh Circuit has stated:  "'Domestic law is properly considered and determined by the court whose function it is to instruct the jury on the law; domestic law is not to be presented through testimony and argued to the jury as a question of fact.'" *United States v. House*, 684 F.3d 1173, 1209 (11th Cir. 2012) (quoting *United States v. Oliveros*, 275 F.3d 1299, 1306-07 (11th Cir. 2001)).  In other words, "[a]n expert may not . . . merely tell the jury what result to reach," and "[a] witness also may not testify to *the legal implications of conduct*." *Montgomery v. Aetna Casualty & Surety Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) (citations omitted, alterations and emphasis supplied).  Instead, "the court must be the jury's *only* source of law." *Id.* (citations omitted, emphasis supplied).

As defendants point out, Dr. Gaut's testimony has been limited in previous

cases for similar reasons. In *United States v. Wilk*, 572 F.3d 1229 (11th Cir. 2009), the Eleventh Circuit upheld the district court's decision to exclude testimony from Dr. Gaut "about whether the officers followed proper police procedure during entry into Wilk's residence." *Id.* at 1235. Specifically, Dr. Gaut had proposed to testify "that the entry team was improperly dressed in civilian clothing, had inadequate police markings, appeared to be armed invaders, and violated established procedure in raiding the residence," all of which would have would have supported Wilk's self-defense, justification, and imperfect self-defense claims. *Id.*

In like manner, the district court in *McIntyre v. Tallahassee Police Dept.*, No. 4:07cv282-RH/WCS, 2008 WL 2766057 (N.D. Fla. March 28, 2008), limited Dr. Gaut's testimony as follows:

> Mr. Gaut may testify within the parameters set forth on the record of the pretrial conference, including (to the extent within his expertise and supported by the record) on the risks confronted by the officers at the time at issue, the manner in which a reasonable officer would deal with those risks, and the location of the decedent and the officers when the decedent was shot. Mr. Gaut must not testify that any witness is or is not telling the truth as the witness understands it. *Mr. Gaut must not testify that any conduct at issue violated the law or Constitution.* Mr. Gaut must not testify on an officer's motivation *or on the adequacy of an officer's training.*

*Id.* at *2 (emphasis supplied).

Finally, in *Feliu v. Rundle*, No. 05-20169-CIV, 2007 WL 4730885 (S.D. Fla.

April 2, 2007), the district court denied a defendant's motion to strike the testimony of Dr. Gaut, who had been offered by the plaintiff as a "police practices expert," *but* did so only after the plaintiff had agreed that Gaut "would not be permitted to testify as a matter of law as to the presence or absence of probable cause . . . ." *Id.* at *1.

In like manner, Dr. Gaut will not be permitted in the present action to offer his opinion as to the ultimate issues of whether there was either probable cause or reasonable suspicion to justify the searches and arrest of plaintiff, whether either of the individual defendants used excessive force, or whether the City of Huntsville should be held liable for the officers' conduct.

That ruling does not mean, however, that Dr. Gaut would not be permitted to testify if the case proceeds to trial before a jury.[8]  The Seventh Circuit recently discussed when expert testimony related to a legal issue should be permitted in a persuasive opinion reported as *Jimenez v. City of Chicago*, 732 F.3d 710 (7th Cir. 2013).  That case involved the testimony of Gregg McCrary, a police practices expert, who testified "about reasonable practices for police investigations and how the investigation of the murder of Eric Morro departed from those practices. . . ." *Id.* at 719.  The Court acknowledged the general rule that "an expert may not offer legal

---

[8] Indeed, defendants never asked the court to strike Dr. Gaut's testimony in its entirety; they only requested that he not be permitted to reach the legal conclusions of "what policies, or what undisputed actions, are, or are not, *constitutional* . . . ." Doc. no. 58, at 4 (emphasis supplied).

opinions," because "[i]t is the role of the judge, not an expert witness, to instruct the jury on the applicable principles of law, and it is the role of the jury to apply those principles of law to the facts in evidence." *Id.* at 721 (alteration supplied).  As a result, McCrary was not permitted to testify as to the absence of probable cause. Instead, he testified "only about reasonable investigative procedures and ways in which evidence from other witnesses did or did not indicate departures from those reasonable procedures." *Id.*  More specifically,

> McCrary testified about the steps a reasonable police investigator would have taken to solve the Morro murder, as well as the information that a reasonable police investigator would have taken into account as the investigation progressed.  He did not try to resolve conflicts in the testimony of different witnesses.  He also did not offer an opinion regarding whether the police had probable cause to arrest Jimenez.  He did point out ways in which evidence from other witnesses indicated that Bogucki and his police colleagues departed from reasonable investigation methods.

*Id.* at 722.   That testimony was determined to be permissible, even though "McCrary's opinions had direct implications for applying legal standards such as probable cause . . . ." *Id.* at 721.  That was because the effect "of [McCrary's] testimony depended on how the jury resolved conflicts among the testimony of other witnesses," and the testimony "would have helped the jury conclude that the departures from reasonable police practices were so important, severe, and numerous that they supported an inference that Bogucki acted deliberately to violate Jimenez's

rights." *Jimenez*, 732 F.3d at 722 (alteration supplied).

Based on all of the above, defendants' motion to strike will be granted in part and denied in part.  Dr. Gaut will not be permitted to testify regarding the ultimate issues of:  whether there was probable cause or reasonable suspicion to justify the searches and arrest of plaintiff; whether either of the individual defendants used excessive force; or whether the City of Huntsville should be held liable for the officers' conduct.  Consequently, and in like manner, this court will not consider such opinions in conjunction with its ruling on defendants' motion for summary judgment. The expert opinion of Dr. Gaut on the issue of whether defendants' actions and policies were consistent with reasonable, typical police practices and procedures is admissible, however, and will be considered by this court.

### III.  SUMMARY OF FACTS

The Huntsville-Madison County 911 Call Center received a report at approximately 10:05 p.m. on Wednesday, March 7, 2012, that the "Captain D's restaurant" located at 402 Governors Drive in Huntsville, Alabama, had been robbed.[9] Shortly after receiving the call, the dispatch operator informed uniformed patrol officers by radio transmissions that the robbery suspects had been described as two

---

[9] Defendants' evidentiary submission, Exhibit A (Affidavit of Jeni Batt), Tab 1 (Calls for Service Report), at D000007.

black males carrying weapons.[10]  Less than a minute later, the dispatcher repeated that the offenders were black males, and added that their faces had been covered by black and white bandanas, one had worn jeans and a black hoodie, the other wore a gray hoodie, they had fled the scene on foot, and both had run in the direction of the nearby "McDonald's restaurant" located less than a block east of Captain D's.[11] Approximately two or three minutes later, an investigator radioed that both black male suspects were approximately 5'10" to 5'11" in height, and both had worn jeans. That same investigator added that one of the suspects was "chubby," carried a silver handgun, and wore a black hoodie and black and white bandana to cover his face, and that the other suspect was "skinny" and wore a gray hoodie.  Neither suspect had been seen after running toward the McDonald's restaurant east of the scene of the robbery.[12]  Approximately four minutes later, the radio dispatcher repeated to all police units a summary of the foregoing information:  *i.e.*, the suspects were two armed black males, both about 5'10" to 5'11" in height and wearing jeans; one was chubby with a black hoodie and black and white bandana; and the other was of slim build and wearing a gray hoodie.[13]

---

[10] Defendants' evidentiary submission, Exhibit B (Affidavit of Burnie Stedham), Tab 5 (Radio Traffic Recording).

[11] *Id.* at 1:03-1:22, 2:23-2:28.

[12] *Id.* at 4:18-4:48.

[13] *Id.* at 8:13-8:30.  The Alabama Uniform Incident/Offense Report related to the robbery described one suspect as a black male in his twenties, approximately 5'11" tall, weighing about 200

Defendant Brian Shockley, a uniformed patrol officer who was on duty that night, responded to the dispatch by driving to the area. He established a perimeter and looked for potential offenders.[14]   He saw another uniformed patrol officer, defendant Charles Nix, parked in his patrol car near the intersection of Pelham Avenue with St. Clair Avenue, approximately one block north of the Captain D's restaurant, and pulled in beside him. As the two officers talked, Officer Nix saw a black male who, he thought, matched the general physical description of one of the robbery suspects walking across the parking lot of the First Baptist Church. The church is located approximately one block west of the scene of the robbery, and less than one block south of where the officers were located. The time was approximately 10:30 p.m.[15]   Officer Nix did not see the man (who turned out to be plaintiff, Mickale Hopkins) walk out of the church building, and he did not know from whence the man had come. Instead, Nix only saw the man walking across the church parking lot to

---

pounds, wearing a blue bandana, gray hoodie, and blue jeans. The second suspect was described as a black male in his twenties, 5'8" tall, 170 pounds, wearing a black hoodie, black skull cap, and a black bandana. Stedham Affidavit, Tab 7, at D000026. The Officer's Supplement to the Incident/Investigation Report stated that one suspect was a black male wearing a gray hooded, zip-up sweatshirt with a blue bandana over his face, and the other suspect was black male wearing a black hooded pullover sweatshirt and a black skullcap and carrying a silver semi-automatic pistol. *Id.* at D000034. Finally, the Incident Report also states that the suspects left the scene carrying a black backpack with white strings. *Id.* at D000028. These descriptions do differ slightly from those provided by the dispatcher, but it is undisputed that the descriptions provided by dispatch were the only ones Officers Nix and Shockley had heard when they encountered plaintiff.

[14] Defendants' evidentiary submission, Exhibit C (Deposition of Brian Shockley), at 10-11.

[15] *Id.* at 11-13.

an automobile.[16]

It is undisputed that plaintiff is a black male, that he was 37 years of age on that date, that he is approximately six feet tall and weighed between 160 and 185 pounds, and that he was wearing jeans and a shirt with the name of the church and his first name on it. Plaintiff was not wearing a hoodie, but Officer Nix testified that he could not recall, when he first observed plaintiff walking across the parking lot, whether he could see what clothes he was wearing.[17]

Plaintiff saw the officers parked nearby while walking to his automobile. When he reached the car, he opened the driver's door, sat down, cranked the engine, and remained sitting for about a minute while he endorsed his paycheck and placed it in the glovebox. In the meantime, Officer Nix pulled his police cruiser behind plaintiff's automobile, parked, exited his vehicle, approached plaintiff's car, and opened the driver's side door, which was unlocked. Officer Nix asked plaintiff if he worked at the church, and plaintiff responded that he did, saying that he was the night janitor. Officer Nix asked plaintiff to step out of his automobile. Plaintiff did not immediately comply, but instead asked what he had done wrong. Officer Nix

---

[16] Defendants' evidentiary submission, Exhibit D (Deposition of Charles Nix), at 25-26.

[17] *See* doc. no. 48 (defendants' summary judgment brief), at 4 (Undisputed Facts 13 & 14); doc. no. 53 (plaintiff's summary judgment response brief), at 1 (Response to Movants' Statement of Facts 13 & 14). *See also* Nix Deposition, at 33-34.

responded that he would explain once plaintiff exited the vehicle.[18]

Plaintiff stepped out of his automobile and, while he was doing so, Officer Nix observed a "gray hoodie" sweatshirt in plain view, bunched up on the front passenger seat.[19]  Officer Nix directed plaintiff to place his hands on the automobile, patted him down, and asked if he had any weapons.  Plaintiff responded "no," and Officer Nix did not detect any on plaintiff's person during the pat-down search.[20]  Nix then explained that the nearby Captain D's restaurant had been robbed, and that plaintiff fit the physical description of one of the suspects as a black man with a hooded sweatshirt.  Plaintiff denied any involvement in the robbery, and said that he had just locked up the church for the evening.[21]

Officer Nix then walked around plaintiff's automobile and illuminated the interior by shining his flashlight through the windows, in order to determine whether he could see any articles "that would be related to a robbery."[22]  As he approached the passenger door, he "saw the gray hoodie, and . . . the handle of a handgun sticking out

---

[18] Defendants' evidentiary submission, Exhibit E (Deposition of Mickale Hopkins), at 45-48.

[19] *Id.* at 52-53; Nix Deposition, at 61-62.

[20] Hopkins Deposition, at 47-48.  Officer Nix testified that Shockley performed the pat-down search.  Nix Deposition, at 58, 60.  However, at the summary judgment stage, this court must accept plaintiff's version of events as true.

[21] Hopkins Deposition, at 48-49.

[22] Nix Deposition, at 62.

from [under] the front [passenger] seat."[23]

Plaintiff testified that Officer Trista Kinsey also arrived at the scene shortly after he had stepped out of his automobile and asked for permission to search the vehicle. Plaintiff testified that he refused permission, but Officer Kinsey proceeded to search anyway. She opened the front passenger door and looked inside. She retrieved a black BB gun from underneath the front passenger seat, which plaintiff acknowledged he kept in the car for "protection."[24]

Plaintiff asked Officer Nix if he was being arrested, and Nix responded that he was, but did not then state the offense for which he was being arrested.[25] Nix handcuffed plaintiff's hands behind his back, performed another weapons search, removed plaintiff's wallet from his pocket, and walked him to Officer Shockley's patrol car, where he placed plaintiff in the back seat.[26] Nix then returned to his own vehicle, where he intended to conduct a records search for outstanding warrants using

---

[23] *Id.* at 66 (alterations supplied).

[24] Hopkins Deposition, at 51-57.

[25] *Id.* at 57.

[26] In contrast to what is stated in text, Nix testified that he directed Officer Shockley to place plaintiff in handcuffs and "detain him for an investigator." Nix Deposition, at 67. Shockley also testified that he was the one who handcuffed plaintiff, conducted a weapons search, obtained plaintiff's wallet and identification from his pocket, and walked plaintiff to his patrol car. *See* Shockley Deposition, at 27-29. Plaintiff testified, however, that it was Officer Nix who did all of those things. *See* Hopkins Deposition, 57-58, 62, 65-66. Consequently, for purposes of summary judgment, the court accepts plaintiff's version of events. That said, the question of which Officer actually handcuffed plaintiff is not material to the resolution of any issues before the court.

16

the identification removed from plaintiff's wallet.

After being placed in the back seat of Officer Shockley's patrol car, plaintiff asked Shockley why he was being arrested, but Shockley responded that he was only being detained for investigation related to the robbery.[27]  Plaintiff remarked that "this is crazy, man.  This is racist right here.  . . .  I'm being accused of doing something I hadn't done.  This is racist.  I just walked out of the building to let my car warm up."[28]   Shockley attempted to explain that plaintiff was being detailed for investigation because he was "in the area of a robbery with a gun in [his] vehicle,"[29] but plaintiff was accepting none of it, saying that the weapon was only a BB gun, and repeating that he was "being accused of something [he] didn't do.  And this is racist. And . . . y'all will be sued.  . . .  Y'all will be sued.  I promise you this.  This is crazy."[30]

After plaintiff was left alone in Officer Shockley's patrol car, he attempted to move his cuffed hands from behind his back to the front of his body by slipping them under his legs.  He testified that the cuffs were hurting him, and that he attempted to bring his hands and arms to the front of his body in order to make himself more

---

[27] Shockley Deposition, at 26-27.

[28] Stedham Affidavit, Tab 2 (Dashboard Camera Video Recording from Officer Shockley's Patrol Car), at 22:34:54 to 22:35:26.

[29] *Id*. at 22:35:32 (alteration supplied).

[30] *Id*. at 22:35:44 to 22:36:16 (alteration supplied).

comfortable.[31]  Police officers, however, refer to any suspect's attempt to move cuffed hands from behind their back to the front of their body as "slipping cuffs," even when the individual is not attempting to remove his hands from the cuffs.[32]

Officer Trista Kinsey was in her patrol car, preparing to leave the scene, when she saw plaintiff's attempt to "slip his cuffs."  She blipped a short blast of the siren on her police cruiser in order to alert Officers Nix and Shockley.[33]

Officer Shockley returned to his patrol car, grabbed plaintiff by the knee, and yanked him to the edge of the back seat.  He then repositioned plaintiff, grabbed his upper body in a "choke hold," and lowered him to the ground.  Plaintiff's knee hit the ground first, and he lay on the ground, face-first, for about ten seconds until he began straining his neck and gasping for breath.[34]  Neither Shockley nor any other officer hit or kicked plaintiff during this encounter.[35]  Even so, Shockley testified that plaintiff had resisted his grip when he attempted to pull plaintiff from the patrol car,[36] and Officer Nix testified that plaintiff kicked at the officers after he was removed from the car.[37]

---

[31] Hopkins Deposition, at 66-68.

[32] Nix Deposition, at 77.

[33] Defendants' evidentiary submission, Exhibit F (Affidavit of Trista Kinsey) ¶¶ 11-12.

[34] Hopkins Deposition, at 69-74, 108; Shockley Deposition, at 32-34.

[35] Hopkins Deposition, at 73-74.

[36] Shockley Deposition, at 32.

[37] Nix Deposition, at 82-84.

While plaintiff was on the ground, he said that the handcuffs had been hurting him, and an unidentified officer responded: "They're hurting you more now, ain't they?"[38]  Another unidentified officer stated: "If you resist any further, you will get hurt.  Do you understand that?  Do you understand that? Hey, dumbass, I'm talking to you."[39]

Officer Nix then stood plaintiff up, removed his hands from the cuffs, repositioned his hands behind his back, and replaced the cuffs.[40]  Plaintiff complained that the cuffs still were too tight, so one of the officers loosened them and returned plaintiff to the back of the patrol car.[41]

After plaintiff was pulled from the back seat of Officer Shockley's car, Officer Trista Kinsey told him that he was "under arrest," and that "[t]he charges are compiling as we speak."[42]

Just before plaintiff attempted to reposition his handcuffs, Officer Nix was speaking over the radio with Michael Nelson, one of the robbery investigators.  Nix

---

[38] Stedham Affidavit, Tab 2 (Dashboard Camera Video Recording from Officer Shockley's Patrol Car), at 22:36:55.

[39] *Id*. at 22:37:01 to 22:37:10.  Stedham Affidavit, Tab 3 (Back Seat Camera Recording from Officer Shockley's Patrol Car), at 2:04-2:16.

[40] Hopkins Deposition, at 74-76; Shockley Deposition, at 35.

[41] Hopkins Deposition, at 77.

[42] Stedham Affidavit, Tab 2 (Dashboard Camera Video Recording from Officer Shockley's Patrol Car), at 22:37:52. Stedham Affidavit, Tab 3 (Back Seat Camera Recording from Officer Shockley's Patrol Car), at 3:02 (alteration supplied).

told Nelson his location, and stated that he had observed a black male sitting in a car, described plaintiff's clothing, and added that a gray hoodie had been bunched up on the front passenger seat of the suspect's automobile.  Nix also related that a black, hand-gun style, BB gun had been found under one of the car seats, and that plaintiff was wearing a shirt from the church as if he worked there.[43]

Nix briefly terminated his conversation with Investigator Nelson when Officer Trista Kinsey sounded a short blast of her cruiser's siren, to alert Nix to the fact that plaintiff was attempting to move his handcuffed hands to the front of his body.  Nix resumed the conversation with Investigator Nelson after the cuffs had been repositioned and plaintiff returned to Officer Shockley's patrol car.[44]

Investigator Nelson instructed Nix to hold plaintiff until he could come to the scene.[45]

---

[43] Stedham Affidavit, Tab 6 (Common Channel), at :05-:13, :19-40.  *See also* doc. no. 48 (defendants' summary judgment brief), at 11 (Undisputed Facts 55-59); doc. no. 53 (plaintiff's summary judgment response brief), at 5 (Response to Movants' Statement of Facts 55-59).  Officer Nix testified that he had been communicating with an Investigator named Browning.  Nix Deposition, at 74-86.  However, in the Statement of Undisputed Material Facts in defendants' brief, they stated that the officers on the scene were communicating with an investigator named Nelson, and plaintiff did not dispute defendants' proposed facts.  Accordingly, the court has considered defendants' proposed facts — including the name of the investigator — to be true.  Ultimately, however, the name of the investigator with whom the defendant officers were communicating is immaterial to the resolution of plaintiff's claims.

[44] Common Channel, at :46-:57.  *See also* doc. no. 48 (defendants' summary judgment brief), at 11-12 (Undisputed Facts 60-61); doc. no. 53 (plaintiff's summary judgment response brief), at 5 (Response to Movants' Statement of Facts 60-61).

[45] Common Channel, at :46-:57, 1:16-1:23, 1:30-1:40.  *See also* doc. no. 48 (defendants' summary judgment brief), at 11-12 (Undisputed Facts 60-65); doc. no. 53 (plaintiff's summary

While waiting for Nelson to arrive, Nix searched the passenger side and trunk of plaintiff' car.[46]   Officer Shockley also picked up the gray shirt from the front passenger seat of plaintiff's auto, and examined it to determine whether it had an emblem, because it had been reported that the gray hoodie worn by one of the robbery suspects had an emblem on it.[47]   At some point while plaintiff was sitting in Officer Shockley's patrol car, Officer Jordan Jones, who also had arrived at the scene, remarked to other officers that "[e]verything was fine until he [*i.e.,* the plaintiff] started that racial bullshit."[48]

In the meantime, plaintiff continued to express his displeasure.  He repeated that he was employed as the nighttime janitor for the church's daycare facility, and worked from 2:00 to 10:30 p.m., Monday through Friday.[49]   He became increasingly agitated, and an Officer whose voice is recorded on the video camera installed in Officer Shockley's cruiser, but who is not otherwise identified in the record,

---

[46] Stedham Affidavit, Tab 2 (Dashboard Camera Video Recording from Officer Shockley's Patrol Car), at :03-1:20, 4:15-4:59; 17:53-18:06).  *See also* doc. no. 48 (defendants' summary judgment brief), at 10 (Undisputed Facts 50-52); doc. no. 53 (plaintiff's summary judgment response brief), at 4 (Response to Movants' Statement of Facts 50-52).

[47] Stedham Affidavit, Tab 2 (Dashboard Camera Video Recording from Officer Shockley's Patrol Car), at 35:31-35:44.  *See also* doc. no. 48 (defendants' summary judgment brief), at 11 (Undisputed Facts 53-54); doc. no. 53 (plaintiff's summary judgment response brief), at 4 (Response to Movants' Statement of Facts 53-54).

[48] Shockley Deposition, at 42-43 (alterations supplied).

[49] *See*, *e.g.*, Stedham Affidavit, Tab 2 (Dashboard Camera Video Recording from Officer Shockley's Patrol Car), at 22:39:29, 22:42:07, 22:55:56, 22:57:23, 22:03:35 to 23:03:51.

21

attempted to calm plaintiff, saying:

> Hey, man.  Hey.  Listen, I just got here.  You are being detained because there's a robbery up the road.
>
> . . . .
>
> As long as you're calm, cool, collected, the investigator's going to talk to you, [and] you can go on your way.  But you know what I am saying?  When you start trying to slip handcuffs, and that kind of stuff, you're creating a problem where there's not one, okay?  You know what I'm saying?
>
> MR. HOPKINS:  These things hurt.  Have you ever had the handcuffs on your hand?
>
> AN OFFICER:  I have.
>
> MR. HOPKINS:  These things hurt. . . . Especially behind your back.
>
> AN OFFICER:  Yes, they do.  There is no comfortable way to have them on.
>
> MR. HOPKINS:  I am not trying to attack nobody.  These things hurt.
>
> AN OFFICER:  I understand.
>
> MR. HOPKINS:  I haven't done — especially if I haven't done nothing.  I'm being treated like this?  This [is] racist.
>
> AN OFFICER:  I understand.  Right now, you're a potential suspect in a felony which has recently occurred.  Once investigators get here and he's confident that you have nothing to do with it, hopefully you can be on your way.

But, if you're slipping handcuffs and doing other stuff, you're going to end up causing a problem when there's not one. So if you just be calm for another few minutes, okay?

MR. HOPKINS: Okay.

AN OFFICER: I don't want to see you — be mad and do something dumb that causes you to get in trouble. You know what I'm saying?

MR. HOPKINS: I understand that. I understand that. But still.

AN OFFICER: I get —

MR. HOPKINS: If the shoe was on the other foot, how would you feel? Would you be happy?

AN OFFICER: No, I wouldn't be happy.

MR. HOPKINS: I know —

AN OFFICER: But at the same time, getting mad and doing dumb things, it can only make it worse. Do you know what I am saying? So just be calm, cool, collected and you're good to go, all right, man?

MR. HOPKINS: All right. (Inaudible). Yeah, this is racist. Don't make no sense. Being treated like that.

AN OFFICER: The thing is — the thing is if he did do it (inaudible) but if you want to be a jackass about it and start that racist bullshit (inaudible).[50]

As the minutes passed, plaintiff began to talk of being harassed and threatened

---

[50] *Id*. at 22:45:04 to 22:48:02 (alterations supplied).

to "press charges": *e.g.*, "I'm pressing charges";[51] "I'm being harassed";[52] "I want to press charges";[53] "I'm being harassed and handcuffed, and everything."[54]   He also asserted that his detention was an example of "racial profiling":  *e.g.*,

> Just because I'm a black male sitting in my car.  That's racial profile.  Racial profile.  I'm suing big time. . . .  (Inaudible) . . . this is not right.  I'm being accused of robbing.  Are you serious?  This is lawsuit right here.[55]

Officer Nix attempted to explain to plaintiff that the offenders who had robbed the Captain D's restaurant were black males, and that plaintiff matched their description:  *e.g.*, he was a black male with the same general height and weight, had a gray hoodie on the seat of his car, was wearing blue jeans, and that:

> All we can go on is what they tell us.  And that's what we look for.  So, to be honest with you, any black male that would be walking right through would've got stopped, because that's our job.  They gave us a description.  We have to stop everybody who looks semi (inaudible).

> You match that description when I walked to the car.  That's the reason I was trying to get you out, I was trying to explain with you [to] go easy with it.[56]

---

[51] *Id.* at 22:53:46.

[52] *Id.* at 22:55:26.

[53] *Id.* at 22:55:38.

[54] *Id.* at 22:55:56.

[55] Stedham Affidavit, Tab 2 (Dashboard Camera Video Recording from Officer Shockley's Patrol Car), at 22:59:16 to 23:02:30.

[56] *Id.* at 23:19:25 to 23:20:10 (alteration supplied).

Plaintiff would accept no explanations, however, and continued to state that he was "[s]till pressing charges.  Racial profile.  Okay.  (Inaudible).  Just got off work. Racial profile.  I don't care what you say."[57]

When Investigator Michael Nelson arrived at the scene, he determined that plaintiff was not one of the robbery suspects.  Officers Nix and Shockley wondered whether plaintiff still could be charged with any other offense, so Nix used his cellular telephone to call the magistrate on duty.  The magistrate advised him not to assert a concealed weapons charge, because the BB gun had been found under the seat of the automobile and not on plaintiff's person.  She did say, however, that plaintiff could be charged with obstructing governmental operations and resisting arrest, because he had to be removed from Officer Shockley's patrol after attempting to reposition his handcuffs.[58]

Officer Shockley transported plaintiff to the Huntsville-Madison County Detention Center, where he was charged with obstructing governmental operations.[59] Plaintiff was booked at approximately 12:30 a.m., about two hours after he was first questioned by Officer Nix.[60]  The Alabama Uniform Incident/Offense Report

---

[57] *Id*. at 23:23:49 (alteration supplied).

[58] Nix Deposition, at 86-89.

[59] Hopkins Deposition, at 80-82.

[60] Stedham Affidavit, Tab 8 (Alabama Uniform Incident/Offense Report), at D000083.

prepared in conjunction with the arrest states that he was arrested because he was

"uncooperative with the officers."[61]   Officer Nix stated in the criminal complaint

submitted in support of plaintiff's arrest that:

> Officers responded to the area of Captain D's for a robbery. While sitting on perimeter I observed Michael [*sic*] Hopkins walking to his car.  Mr. Hopkins matched the description of one of the offenders in the robbery.  I checked out the vehicle Mr. Hopkins was sitting in. *While attempting to get Mr. Hopkins out of the vehicle he became aggressive towards officers and would not cooperate.*  After locating a [*sic*] Air Powered BB Gun in the car officers handcuffed Mr. Hopkins so that they could continue their investigation.  After being placed in the back of the patrol car Mr. Hopkins attempted to slip his cuffs.  Officers had to stop their investigation to get the cuffs back behind Mr. Hopkins. *In the process of removing Mr. Hopkins from the patrol car to fix the cuffs he attempted to kick officers.*  When initial contact was made officers asked Mr. Hopkins his name and he advised it was on his shirt but continued to say officers were being racist and racial profiling, thereby hindering the investigation.[62]

Plaintiff's car was impounded following his arrest.[63]  Sergeant Burnie Stedham

testified in an affidavit that it is the policy of the Huntsville Police Department to

impound a vehicle when the driver is taken into custody and there is no one available

to take possession of the vehicle.[64]

---

[61] *Id.* at D000086.

[62] Defendants' evidentiary submission, Exhibit G (Municipal Court Records), at D000103-D000104 (alterations and emphasis supplied).

[63] *See also* doc. no. 48 (defendants' summary judgment brief), at 12 (Undisputed Fact 68) ("Plaintiff's car was impounded pursuant to standard procedure of the HPD."); doc. no. 53 (plaintiff's summary judgment response brief), at 5 (Response to Movants' Statement of Fact 68) ("Admitted that Plaintiff's car was impounded.").

[64] Stedham Affidavit ¶ 7.

Several days after his arrest, plaintiff noticed that his knee was stiff, and he experienced pain in his neck that made it difficult for him to swallow.  He visited his doctor and received chiropractic treatment.[65]

## IV.  DISCUSSION

Plaintiff sued Officers Charles Nix and Brian Shockley in their individual and official capacities.  Although defendants did not raise this issue, it is clear that plaintiff's claims against Nix and Shockley in their official capacities should be dismissed because they are redundant of plaintiff's claims against the City itself. That is because official-capacity suits

> "generally represent only another way of pleading an action against an entity of which an officer is an agent."  *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n. 55, 98 S .Ct. 2018, 2035, n. 55, 56 L. Ed. 2d 611 (1978).  As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. *Brandon*[ *v. Holt*]*,* 469 U.S. [464], 471-472 [(1985)].

*Kentucky v. Graham,* 473 U.S. 159, 165-66 (1985) (alterations supplied).

On the other hand, Officers Nix and Shockley rely upon the doctrine of qualified immunity as a defense to plaintiff's individual capacity claims.  Qualified immunity protects governmental officials who are sued under 42 U.S.C. § 1983 for money damages in their personal, or individual, capacities, but only so long as "their

---

[65] Hopkins Deposition, at 90-91.

conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

## A.   **Qualified Immunity**

Courts generally apply a two-part test for evaluating whether a defendant is entitled to qualified immunity. The "threshold question" is whether the facts, viewed in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right? *Saucier v. Katz,* 533 U.S. 194, 201 (2001).[66] If that threshold question is answered "yes," the court will proceed to analyze the second aspect of the two-part inquiry: was the right "clearly established"? *Id.*[67]

In determining whether the unlawfulness of an official's actions was clearly established, "'the salient question is whether the state of the law [at the time of the

---

[66] The defendant claiming immunity must also "prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)). Here, it cannot reasonably be disputed that defendants Nix and Shockley were acting within the scope of their discretionary authority as police officers for the City of Huntsville during the course of all events forming the basis of plaintiff's complaint.

[67] The Supreme Court has relieved lower courts from mandatory adherence to the order of the two-part analysis articulated in *Saucier*. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory."). It is now within this court's discretion to, in appropriate cases, assume that a constitutional violation occurred for the purpose of addressing, in the first instance, whether such a violation would be "clearly established." *Id.* That said, and under the circumstances of the present case, the tested sequence of analysis of *Saucier* will be followed.

unconstitutional act] gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional.'" *Williams v. Consolidated City of Jacksonville,* 341 F.3d 1261, 1270 (11th Cir. 2003) (alterations in original) (quoting *Hope v. Pelzer,* 536 U.S. 730, 741 (2002)).  The Supreme Court has rejected the requirement that the facts of previous cases must always be "materially similar" to those facing the plaintiff.  *Hope*, 536 U.S. at 739.  Instead,

> [f]or a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, *see Mitchell* [*v. Forsyth,* 472 U.S. 511,] 535, n. 12, 105 S. Ct. 2806, 86 L. Ed. 2d 411; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

*Hope,* 536 U.S. at 741 (alterations in original).

As the Eleventh Circuit has observed, there are various ways in which an officer can be placed on "fair notice" that certain conduct is unlawful.

> First, the words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the *total absence of case law.*  This kind of case is one kind of "obvious clarity" case.  For example, the words of a federal statute or federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful.

Second, if the conduct is not so egregious as to violate, for example, the Fourth Amendment on its face, we then *turn to case law.* When looking at case law, some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts. *See Marsh* [*v. Butler County, Ala.*], 268 F.3d [1014,] 1031-32 n.9 [11th Cir. 2001]. For example, if some authoritative judicial decision decides a case by determining that "X Conduct" is unconstitutional *without tying* that determination to a particularized set of facts, the decision on "X Conduct" can be read as having clearly established a constitutional principle: put differently, the precise facts surrounding "X Conduct" are immaterial to the violation. These judicial decisions can control "with obvious clarity" a wide variety of later factual circumstances. These precedents are hard to distinguish from later cases because so few facts are material to the broad legal principle established in these precedents; thus, this is why factual differences are often immaterial to the later decisions. But for judge-made law, there is a presumption against wide principles of law. And if a broad principle in case law is to establish clearly the law applicable to a specific set of facts facing a governmental official, it must do so "with obvious clarity" to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.

Third, if we have no case law with a broad holding of "X" that is not tied to particularized facts, we then look at precedent *that is tied to the facts.* That is, we look for cases in which the Supreme Court or we, or the pertinent state supreme court has said that "Y Conduct" is unconstitutional in "Z Circumstances." We believe that most judicial precedents are tied to particularized facts and fall into this category. . . . When fact-specific precedents are said to have established the law, a case that is fairly distinguishable from the circumstances facing a government official cannot clearly establish the law for the circumstances facing that government official; so, qualified immunity applies. On the other hand, if the circumstances facing a government official are not fairly distinguishable, that is, are materially similar, the precedent can clearly establish the applicable law.

*Vinyard v. Wilson,* 311 F.3d 1340, 1350-52 (11th Cir. 2002) (emphasis in original, alterations supplied). *See also Ashcroft v. al-Kidd,* – U.S. – , 131 S. Ct. 2074, 2083 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.").

**B**.   **Illegal Search and Seizure Claims**

Plaintiff asserts that his detention, and the search of his person and vehicle, violated his Fourth Amendment rights to be free from unreasonable searches and seizures.[68]

**1**.   **Initial stop and frisk**

Plaintiff challenges the officers' initial decision to "stop and frisk" him in the parking lot.

> The Supreme Court has held that "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' *even if the officer lacks probable cause*." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). To determine the legality of an investigatory stop under the Fourth Amendment, we first ascertain whether the stop was justified at its inception. *See United States v. Street*, 472 F.3d 1298, 1306 (11th Cir. 2006). We then ask whether the officer's actions were reasonably related in scope to the circumstances that justified the stop in the first

---

[68] *See* U.S. Const. amend. IV (1791) ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.").

place. *See id.*  In making these assessments, we look at "the totality of
the circumstances — the whole picture[.]" *United States v. Cortez*, 449
U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981).

*United States v. Griffin*, 696 F.3d 1354, 1358 (11th Cir. 2012) (emphasis supplied,

alteration in original).  Moreover,

> [o]nce an officer has stopped an individual, he may conduct a
> pat-down or frisk for weapons if he reasonably believes that his safety,
> or the safety of others, is threatened. *See, e.g., United States v. White*,
> 593 F.3d 1199, 1202 (11th Cir. 2010). . . .  *Terry* does not demand
> definitive evidence of a weapon or absolute certainty that an individual
> is armed.  The process of evaluating whether reasonable suspicion exists
> under *Terry* "does not deal with hard certainties, but with probabilities."
> *Cortez*, 449 U.S. at 418, 101 S. Ct. 690.  "'[T]he issue is whether a
> reasonably prudent man in the circumstances would be warranted in the
> belief that his safety or that of others was in danger.'"  *White,* 593 F.3d
> at 1202-03 (quoting *Terry*, 392 U.S. at 27, 88 S. Ct. 1868).

*Griffin*, 696 F.3d at 1359 (first alteration supplied, other alterations in original).

Here, according to plaintiff's account of events, Officer Shockley did not

conduct the initial questioning of plaintiff or the initial weapons pat-down, so he

cannot be held liable for any Fourth Amendment violations that might have resulted

from those actions.

Officer Nix's initial questioning of plaintiff was supported by a reasonable

suspicion that plaintiff might have been one of the offenders involved in the Captain

D's robbery.  Officer Nix saw plaintiff, a black male, walking across the church

parking lot, approximately one block west of the Captain D's restaurant, within thirty

32

minutes of the robbery.  At that time, the only information about the robbery suspects possessed by Nix had been provided by a police dispatcher:  *i.e.,* the offenders were two black males who left the scene on foot, wearing blue jeans and black and white bandanas on their faces, with one suspect wearing a black hoodie and the other wearing a gray hoodie.  Both suspects were approximately 5'10" to 5'11" in height, one was of slim build, and the other was "chubby."  Plaintiff, who stands six feet tall, was within an inch or two of the height reported by dispatch, and his weight of between 160 and 185 pounds could have placed him within the physical description of the suspects.  Plaintiff also was wearing jeans.

Thus, even though plaintiff's physical characteristics and clothing were not *exactly* the same as the suspects, there is no credence to plaintiff's assertion that "his physical description bore *absolutely no resemblance* to the robbery suspects, other than the fact that he was a black male."[69]  The approximate thirty-minute lapse between the time of the robbery and Officer Nix's confrontation with plaintiff also was not so long that it was unreasonable for Nix and Shockley to continue to look for suspects in the area, and the one-block distance between the scene of the robbery and the church parking lot was not too far for an offender to have reasonably traveled on foot during that thirty minutes.  Moreover, while it now is undisputed that plaintiff

---

[69] Doc. no. 53 (plaintiff's summary judgment response brief), at 19 (emphasis in original).

was only walking to his car from the church building, Officer Nix did not know that when he began to question him.  All Officer Nix saw was plaintiff walking across the parking lot and entering an automobile.

Officer Nix also had reasonable suspicion to support his initial "frisk" or "pat-down" search.  Plaintiff did not immediately comply with Officer Nix's request to step out of his car.  Instead, he demanded to know what he had done wrong.  When plaintiff did step out of the automobile, Officer Nix spotted a gray sweatshirt in plain view on the front passenger seat.  Even if that sweatshirt was bunched up, such that Officer Nix could not ascertain whether it had a hood, the mere presence of such a shirt, combined with plaintiff's other physical similarities to the suspects (at least one of whom had used a weapon during the robbery), and his proximity to the scene of the crime, could have caused a reasonably prudent person in Officer Nix's situation to believe that his safety, and that of others in the general vicinity, might be in jeopardy.  Therefore, Officer Nix's decision to conduct a pat-down search for weapons was supported by reasonable suspicion, and did not violate plaintiff's Fourth Amendment right to be free from unreasonable searches and seizures.

In summary, both officers are entitled to qualified immunity on this claim.  There is no clearly established law to place Officer Shockley on fair warning that he could be held liable for a stop and search in which he did not participate.  Further, for

the reasons stated above, Officer Nix had at least *arguable* reasonable suspicion to initially detain plaintiff and conduct a weapons search, so he also is entitled to qualified immunity. *See Whittier v. Kobayashi*, 581 F.3d 1304, 1308 (11th Cir. 2009) ("In the context of qualified immunity, this Court has stated 'the issue is not whether reasonable suspicion existed in fact, but whether the officer had "arguable" reasonable suspicion.'" (quoting *Jackson v. Sauls*, 206 F.3d 1156, 1166 (11th Cir. 2000)).

### 2.   The initial search of plaintiff's vehicle

Plaintiff next challenges the initial search of his vehicle by Officer Trista Kinsey, who found a BB gun under his front passenger seat.  According to plaintiff, Officer Kinsey retrieved that object from under the front passenger seat of his automobile, even though he had refused her request to search the vehicle.  Officers Nix and Shockley cannot be held liable for a search in which they did not participate, and plaintiff did not name Officer Kinsey as a defendant in this case.  Accordingly, summary judgment is due to be granted on this claim.

### 3.   Other searches

Plaintiff also asserts in his brief that "subsequent searches" of his vehicle also violated the constitution, but he does not specify the searches to which he refers, or

explain why he thinks those unspecified searches were illegal.[70]

The only other searches discussed in the record — besides Officer Nix's spotting of plaintiff's sweatshirt in plain view, and Officer Kinsey's retrieval of the BB gun from underneath plaintiff's front passenger seat — were: (*i*) Officer Nix's search of the passenger side and trunk of plaintiff's car (which occurred after plaintiff's attempt to "slip his cuffs" had been thwarted, and plaintiff reseated in Officer Shockley's patrol car); and (*ii*) Officer Shockley's close inspection of the gray sweatshirt to determine whether it had an emblem on it. Defendants assert that those searches were proper because they occurred *after* plaintiff had been placed under arrest, and after it had become apparent that plaintiff's automobile would have to be impounded. Inventory searches of impounded vehicles pursuant to reasonable, consistent police policies are legal. *See South Dakota v. Opperman*, 428 U.S. 364, 369-76 (1976).[71]

Plaintiff does not dispute defendants' legal argument that an impound search after plaintiff's arrest would have been permissible. Instead, he simply challenges whether he actually was under arrest when the additional searches of his automobile

---

[70] *Id.* at 22.

[71] Here, plaintiff's automobile had not yet been impounded, but it is undisputed that the regular procedure of the Huntsville Police Department would have been to impound the vehicle after plaintiff's arrest because there was no one else at the scene to take possession of the car. Thus, the fact that the car had not yet been impounded is not material.

were conducted.  The evidence on that issue is in conflict.  On one hand, *plaintiff testified that* Officer Nix told him he was under arrest as soon as Officer Kinsey retrieved the BB gun from underneath the front passenger seat of his automobile.  On the other hand, *Officer Shockley testified* that, when plaintiff was first placed in the back seat of his patrol car, plaintiff was not then under arrest, but only being detained for investigation.  That inconsistency thus presents an unusual circumstance: *that is*, the plaintiff's testimony actually is more harmful to his case than the testimony of one of the defendants.  While the court is required to construe all facts in the light most favorable to plaintiff for purposes of summary judgment, that duty does not extend to rejecting the plaintiff's own testimony when it is harmful to his case.  As the Eleventh Circuit has stated:

> When the nonmovant has testified to events, we do not . . . pick and choose bits from other witnesses' essentially incompatible accounts (in effect, declining to credit some of the nonmovant's own testimony) and then string together those portions of the record to form the story that we deem most helpful to the nonmovant.  Instead, when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's *version.*  Our duty to read the record in the nonmovant's favor stops short of not crediting the nonmovant's testimony in whole or part: the courts owe a nonmovant no duty to disbelieve his sworn testimony which he chooses to submit for use in the case to be decided.

*Evans v. Stephens,* 407 F.3d 1272, 1278 (11th Cir. 2005) (emphasis in original).

Thus, the court will accept plaintiff's testimony that he was placed under arrest

after Officer Kinsey retrieved his BB gun.  As such, any subsequent searches of plaintiff's automobile and the close inspection of his sweatshirt would have been incident to an impoundment search and, therefore, constitutionally permissible.[72]

## C.  Illegal Arrest

Plaintiff also claims that his arrest for the offense of obstructing government operations violated the Fourth Amendment.  To establish a violation of that amendment when making an arrest, the plaintiff must show that his arrest was "unreasonable."  *See*, *e.g.*, *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989) ("Seizure alone is not enough for § 1983 liability; the seizure must be unreasonable.")

---

[72] Defendants also argue in their brief that any claim by plaintiff that the length of his detention was unconstitutional must fail.  *See* doc. no. 48 (defendants' summary judgment brief), at 25-26.  Plaintiff did not respond to this argument in his brief, thereby effectively abandoning any claim he might have had based on the length of his detention.  Issues and contentions not raised in a party's brief are deemed abandoned.  *See*, *e.g.*, *Chapman v. AI Transport,* 229 F.3d 1012, 1027 (11th Cir. 2000) (*en banc*) ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned)).

> In opposing a motion for summary judgment, a party may not rely on his pleadings to avoid judgment against him.  There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned. . . .

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citations and internal quotation marks omitted).

38

(internal quotation marks and citation omitted).  An arrest is unreasonable when it is not supported by probable cause.  *See*, *e.g.*, *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004).  "Probable cause is defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense."  *Id.* (citing *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)).

Courts have recognized that "[t]he probable-cause standard [often] is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances."  *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (alterations supplied).  *See also Illinois v. Gates*, 462 U.S. 213, 232 (1983) ("[P]robable cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules.") (alteration supplied).

The best that can be said is this:  probable cause to effect an arrest exists if, at the moment the arrest was made, "the facts and circumstances within [the officers'] knowledge *and of which they had reasonably trustworthy information* were sufficient to warrant a prudent man in believing" that the person arrested either had committed, or was in the process of committing, an offense.  *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)) (alteration and emphasis supplied).  *See also Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("Whether

probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.").

Therefore, "[t]o determine whether an officer had probable cause to arrest an individual, [courts] examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Pringle*, 540 U.S. at 371 (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)) (alterations supplied).

At the same time, courts must refer to the elements of the charge on which a person was arrested, because the question of "[w]hether a particular set of facts gives rise to probable cause . . . to justify an arrest for a particular crime depends, of course, on the elements of the crime." *Crosby*, 394 F.3d at 1333 (alteration supplied).

Alabama law defines the offense for which plaintiff was arrested as follows:

> A person commits the crime of obstructing governmental operations if, by means of intimidation, physical force or interference or by any other independently unlawful act, he:
>
> > (1) Intentionally obstructs, impairs or hinders the administration of law or other governmental function; or
> >
> > (2) Intentionally prevents a public servant from performing a governmental function.

Ala. Code § 13A-10-2 (1975). A "governmental function" is defined as "[a]ny activity which a public servant is legally authorized to undertake on behalf of a

government or the fire control activities of a member of a volunteer fire department."
Ala. Code § 13A-10-1(3) (1975) (alteration supplied).  A "public servant" is "[a]ny
officer or employee of government, including legislators and judges and any person
or agency participating as an adviser, consultant, or otherwise in performing a
governmental function."  Ala. Code § 13A-10-1(7) (1975) (alteration supplied).  The
term "government" includes a municipality.  Ala. Code § 13A-10-1(2) (1975).

Officers Nix and Shockley assert that they had probable cause to arrest plaintiff
for obstructing governmental operations because he attempted to "slip his cuffs"
while the officers were investigating whether he was one of the persons involved in
the Captain D's robbery.[73]  According to the brief presented by defendants' attorneys,
plaintiff's actions "directed their attention away from the investigation of the armed
robbery and toward handling plaintiff and the threat he had become. . . .  In doing so,
plaintiff 'interfered with their duty to, and impaired their governmental function of,
investigating an armed robbery . . . ."[74]

This court agrees that plaintiff's physical act of "slipping his cuffs" was

---

[73] Plaintiff makes much of defendants' description of this action as an attempt by plaintiff to
"slip his cuffs."  It is undisputed that "slipping cuffs" is simply the phrase used by Huntsville police
officers to describe a person who attempts to move their handcuffs from the back of the body to the
front, as plaintiff did.  There is no evidence, or even any inference by defendants, that plaintiff ever
tried to actually escape his handcuffs.  Thus, anywhere the term "slipping cuffs" is used in this
opinion, it will refer only to plaintiff's attempt to bring his cuffed hands from back to front.

[74] Doc. no. 48 (defendants' summary judgment brief), at 27.

disruptive of their investigation into the Captain D's robbery, although any disruption was minimal *at best*.  Even so, as defendants acknowledge, there is no evidence — and there was no indication at the time of the arrest — that plaintiff *intended* to interfere with the robbery investigation.  That is not material to the probable cause determination, however.  While the elements of the offense must be taken into consideration in evaluating probable cause, it is not necessary for the arresting officer to produce "'the same type of specific evidence of each element of the offense as would be needed to support a conviction.'" *Holmes v. Kucynda*, 321 F.3d 1069, 1079 (11th Cir. 2003) (quoting *Adams v. Williams*, 407 U.S. 143, 149 (1972)).  Considering the totality of the facts and circumstances within the knowledge of Officers Nix and Shockley at the time of plaintiff's arrest, this court concludes that they had sufficient information to reasonably believe that plaintiff had committed the offense of obstructing governmental operations.

Specifically, because the magistrate on duty informed Officer Nix that an arrest for *either* obstructing governmental operations *or* resisting arrest would be proper under the circumstances, the officers had "reasonably trustworthy information" to support their belief that plaintiff had committed the offense of obstructing governmental operations.  *See Hunter*, 502 U.S. at 228.

Moreover, plaintiff's arrest was supported by at least *arguable* probable cause,

which is all that is required for Officers Nix and Shockley to be entitled to qualified immunity from plaintiff's false arrest claim.  *See Crosby*, 394 F.3d at 1332 ("Qualified immunity applies when there was *arguable* probable cause for an arrest even if *actual* probable cause did not exist.") (emphasis supplied) (citing *Jones v. Cannon*, 174 F.3d 1271, 1283 n. 3 (11th Cir. 1999)); *Cottrell v. Caldwell,* 85 F.3d 1480, 1485 n.1 (11th Cir. 1996) ("[W]hen the claim is that a search and seizure or arrest violated the Fourth Amendment, qualified immunity depends upon whether arguable probable cause existed.") (alteration supplied).[75]  A reasonable officer in either Nix's or Shockley's position could have believed that there was probable cause to arrest plaintiff for obstructing governmental operations.  Accordingly, Nix and Shockley are entitled to qualified immunity on the false arrest claim.

## D.   **Excessive Force**

Plaintiff also claims that both individual defendants violated his right to be free from the use of excessive force.  "The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest."  *Lee v. Ferraro*, 284 F.3d 1188,

---

[75] "*Arguable* probable cause exists if, under all of the facts and circumstances, an officer reasonably could — not necessarily would — have believed that probable cause was present." *Crosby*, 394 F.3d at 1332 (emphasis supplied).  "When performing our arguable probable cause analysis, we look at the information known to the officer at the time of the arrest." *Bailey v. City of Miami Beach,* 476 F. App'x 193, 197 (11th Cir. 2012) (citing *Jones*, 174 F.3d at 1283 n. 4).

1197 (11th Cir. 2002) (citing *Graham v. Connor*, 490 U.S. 386, 394-95 (1989)).  The reasonableness inquiry is an objective one:  "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham,* 490 U.S. at 397 (citations omitted).  In other words, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."  *Id*. (citations omitted) (alteration supplied).

The court may consider a number of factors when determining whether the force applied was "reasonable" under the circumstances, including:  (1) the "severity, or lack of severity, of the alleged crime in issue," *id*. at 396; (2) "whether the person against whom the force was used posed an immediate threat to the safety of the police or others," *id*.; (3) "the need for the application of force," *Jackson v. Sauls*, 206 F.3d 1156, 1170 n.18 (11th Cir. 2000); (4) "the relationship between the need and the amount of force used," *id*.; (5) "the extent of the injury inflicted," *id*.; (6) "whether the force was applied in good faith or maliciously and sadistically," *id*.; (7) "the possibility that the persons subject to the police action are themselves violent or dangerous," *id*.; (8) "the possibility that the suspect may be armed," *id*.; (9) "the number of persons with whom the police officers must contend at one time," *Jackson,*

44

206 F.3d at 1170 n.18; and (10) "whether the suspect was resisting or fleeing." *Id*.

The reasonableness of the force applied also is measured as of the precise moment it is administered; events that occurred before that moment, though perhaps giving factual context to the use of force, are not probative of the reasonableness of the decision to use force. *See Greenidge v. Ruffin*, 927 F.2d 789, 792 (4th Cir. 1991). Additionally, "[u]se of force must be judged on a case-by-case basis 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993) (quoting *Graham*, 490 U.S. at 396) (alteration supplied). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

Plaintiff contends that excessive force was used when he was yanked from the patrol car and subdued on the ground in a choke hold after he attempted to move the handcuffs from behind his back to the front of his body.[76]

As an initial matter, it is undisputed that only Officer Shockley removed

---

[76] Second Amended Complaint ¶ 40 ("Defendant[s] Nix and Shockley used excessive and unreasonable force against Plaintiff by pulling him out of a vehicle, throwing him to the ground and choking him from behind though he was not resisting arrest.") (alteration supplied).

plaintiff from the patrol car.   Accordingly, Officer Nix is entitled to summary judgment on plaintiff's claim for excessive force.

Moreover, the court concludes that Officer Shockley's use of force was reasonable under the circumstances.  The action of plaintiff that precipitated Officer Shockley's use of force — "slipping his cuffs" — was not very severe, but the armed robbery the officers were attempting to investigate *was* severe and, at the time force was used, plaintiff was still considered a possible suspect.  *See Durruthy v. Pastor,* 351 F.3d 1080, 1094 (11th Cir. 2003) ("This circuit has made clear that *some* use of force by a police officer when making a custodial arrest is necessary and altogether lawful, regardless of the severity of the alleged offense.") (emphasis supplied) (citations omitted).  Officer Shockley knew that plaintiff was not armed, because a weapons search had already been conducted, but he did not know at the time the force was applied whether plaintiff was attempting to escape his handcuffs in order to flee or do possible harm to the officers, or whether he was merely adjusting the cuffs for comfort.  Officer Shockley did know that plaintiff had not complied with all of the directives that he and the other officers had issued since they first encountered him. On the other hand, the need for the use of force was not that great, considering that plaintiff remained in handcuffs, and had the chain of the handcuffs awkwardly positioned between his legs after attempting to move the cuffs to the front of his

body.  The choke hold caused plaintiff to gasp for breath, but only for about ten

seconds.  *See Zivojinovich v. Barner,* 525 F.3d 1059, 1072 (11th Cir. 2008) ("[U]sing

an uncomfortable hold to escort an uncooperative and potentially belligerent suspect

is not unreasonable.") (alteration supplied).[77]   Considering all of these factors, the

court concludes that the amount of force Officer Shockley used was reasonably

necessary to achieve the legitimate law enforcement purpose of subduing plaintiff and

repositioning his handcuffs.  The use of force was more "minimal" than "excessive."

Accordingly, Officer Shockley is entitled to summary judgment on plaintiff's Fourth

Amendment excessive force claim.

## E.   Conspiracy to Violate Constitutional Rights

Plaintiff also asserted in his Second Amended Complaint that Officers Nix and

Shockley, motivated by a racially-discriminatory animus, "agreed and acted together

to initiate an unlawful *Terry* stop," resulting in a seizure and search of plaintiff "in

violation of his right to equal protection under the law, which lead [*sic*] to his

---

[77] Plaintiff asserts that the unidentified officer's taunt about the handcuffs hurting plaintiff more after he was removed from the police car indicates a malicious intent.  However, any malice implied in that comment is tempered by the fact that, as soon as plaintiff complained that his handcuffs had been re-applied too tightly, one of the officers loosened them.  Moreover, there is no evidence that the comment was uttered by either Nix or Shockley, the only two individual defendants in this case.  Finally, even though plaintiff suffered some knee stiffness and neck pain requiring chiropractic treatment after this incident, there is no indication that he suffered any serious or permanent injuries. *See Rodriguez v. Farrell,* 280 F.3d 1341, 1352 (11th Cir. 2002) ("Painful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal.") (citations omitted).

wrongful arrest and imprisonment . . . .["78]  According to plaintiff, those actions violated 42 U.S.C. § 1985(3), which states:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

Plaintiff also states that Nix and Shockley "had actual knowledge of their agreement to wrongfully stop Hopkins, had the power to stop the conspiracy, yet both refused to prevent the *Terry* stop."[79]  According to plaintiff, those actions and inactions violated 42 U.S.C. § 1986, which states:

> Every person who, having knowledge that any of the wrongs

---

[78] Second Amended Complaint ¶¶ 44-50 (alterations supplied).

[79] *Id.* ¶ 49.

conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action . . . .

Plaintiff cannot prevail on this claim because of the intracorporate conspiracy

doctrine.  Under that doctrine,

a corporation's employees, acting as agents of the corporation, are deemed incapable of conspiring among themselves or with the corporation.  This doctrine stems from basic agency principles that "attribute the acts of agents of a corporation to the corporation, so that all of their acts are considered to be those of a single legal actor." *Dussouy v. Gulf Coast Inv. Corp.,* 660 F.2d 594, 603 (5th Cir. Nov. 1981); *see also United States v. Hartley,* 678 F.2d 961, 970 (11th Cir. 1982).  The reasoning behind the intracorporate conspiracy doctrine is that it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself, just as it is not possible for an individual person to conspire with himself. *See Dussouy,* 660 F.2d at 603 (explaining that "the multiplicity of actors necessary to conspiracy" is negated when the agents' acts are attributed to the corporation and the corporation and its agents are viewed as a single legal actor); *Nelson Radio & Supply Co., Inc. v. Motorola, Inc.,* 200 F.2d 911, 914 (5th Cir. 1952) (stating that "[a] corporation cannot conspire with itself any more than a private individual can").  This doctrine has been applied not only to private corporations but also to public, government entities. *See Chambliss v. Foote,* 562 F.2d 1015 (5th Cir.1977), *aff'g,* 421 F. Supp. 12, 15 (E.D. La. 1976) (applying the intracorporate conspiracy doctrine to bar a § 1985(3) claim against a public university and its officials); *see also Wright v. Illinois Dept. of Children & Family Servs.,* 40 F.3d 1492, 1508 (7th Cir. 1994) (holding

that the intracorporate conspiracy doctrine applies not just to private entities but also to government agencies such as the Department of Children and Family Services); *Runs After v. United States,* 766 F.2d 347, 354 (8th Cir. 1985) ("The Tribal Council as an entity or governmental body cannot conspire with itself.").

*Dickerson v. Alachua County Commission,* 200 F.3d 761, 767 (11th Cir. 2000) (alteration in original, footnote omitted).  As defendants point out, both Nix and Shockley are employees of the same governmental entity, the Huntsville Police Department, and there is no evidence that any non-Police Department employees were on the scene during the events that led to this lawsuit.  Accordingly, it is a legal impossibility for Nix and Shockley to have conspired together to violate plaintiff's constitutional rights, and summary judgment is due to be granted on plaintiff's claims under 42 U.S.C. §§ 1985(3) and 1986.[80]

## F.   Constitutional Claim Against the City

Plaintiff's Second Amended Complaint alleges that the City of Huntsville "maintained a policy or custom by which it failed to adequately train or supervise its police officers in making *Terry* stops, and said policy or custom was the moving force causing the violation of Plaintiff's rights," including his "right to be free from unreasonable searches and seizures, his rights against false arrest and imprisonment,

---

[80] In addition, plaintiff effectively abandoned these claims by not offering any response to defendants' well-founded arguments that summary judgment should be granted.  *See* note 72, *supra.*

50

and his right to be free from the use of excessive force by police . . . ."[81]  Essentially, plaintiff seeks to hold the City liable for the constitutional violations allegedly committed by Nix and Shockley.

Because the court already has found that Nix and Shockley did not commit constitutional violations, or that they at the very least are entitled to qualified immunity from plaintiff's claims, there is no basis for holding the City liable.  *See McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) ("[T]o impose § 1983 liability on a municipality, a plaintiff must show[, among other things,] that his constitutional rights were violated") (alterations supplied).[82]  Accordingly, summary judgment is due to be granted on plaintiff's claim against the City of Huntsville.

## G.  State Law Claims

---

[81] Second Amended Complaint ¶¶ 52-53.

[82] Plaintiff also makes an argument in his brief that Officers Nix and Shockley violated the Huntsville Police Department's Written Directive 101-26, which prohibits bias-based profiling. *See* doc. no. 53 (plaintiff's summary judgment response brief), at 31-32; plaintiff's evidentiary submission, at Exhibit 2 (Bias-Based Profiling Written Directive).  It is unclear whether plaintiff intended that argument to support the City's liability for the officers' alleged conduct, or whether he intended to assert a separate claim against the officers for violating the Written Directive.  In any event, plaintiff has not asserted that violation of the Written Directive infringed upon his *constitutional* rights.  *See* doc. no. 53 (plaintiff's summary judgment response brief), at 31 ("*In addition to violating Plaintiff's Constitutional rights*, Officers Nix and Shockley also violated the written directive on race based profiling set forth by the Huntsville Police Department.") (emphasis supplied).  He also has not suggested that there exists any other independent cause of action for violation of the Written Directive.  Moreover, as the court has found no constitutional violations by either of the individual officers, there is no need to consider whether any non-compliance with the Written Directive against bias-based profiling, or any deficiencies in the policy itself, should affect the City's liability for the officers' alleged constitutional violations.

The only remaining claims are plaintiff's state law claims against Nix and Shockley for assault and battery and false arrest/imprisonment.[83]  In cases where the federal district court has original jurisdiction over some of the claims, the court also has discretion to entertain state claims that are supplemental to the federal claim.  *See* 28 U.S.C. § 1367(a).  The district court may decline to exercise supplemental jurisdiction when:

(1)   the claim raises a novel or complex issue of State law,

(2)   the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3)   *the district court has dismissed all claims over which it has original jurisdiction*, or

(4)   in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c) (emphasis supplied).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Carnegie-Mellon University v. Cohill,* 484 U.S. 343, 350 n.7 (1988) (alteration supplied).

Here, plaintiff's federal claims have been eliminated.  Accordingly, this court

---

[83] *See* Second Amended Complaint, at Counts VI and VII (incorrectly designated Count VI).

declines supplemental jurisdiction over the remaining state law claims, and exercises its discretion to dismiss those claims.

## V.  CONCLUSION AND ORDERS

In accordance with the foregoing, defendants' motion to strike is GRANTED in part and DENIED in part.  The court did not consider any testimony from plaintiff's expert witness, Dr. William Gaut, regarding the ultimate issues of whether probable cause was present to justify the searches and arrest of plaintiff, whether either of the individual defendants used excessive force, or whether the City of Huntsville should be held liable for the officers' conduct.  To the extent Dr. Gaut offered testimony regarding whether defendants' actions and policies were consistent with reasonable, typical police practices and procedures, that testimony has been considered.

Defendants' motion for summary judgment is GRANTED in part and DENIED in part.  All of plaintiff's federal claims (Counts I-V) are DISMISSED with prejudice. His state law claims (Counts VI-VII) are DISMISSED without prejudice to plaintiff's right to reassert those claims in an appropriate state forum, if he chooses.

Costs are taxed to plaintiff.  The Clerk is directed to close this file.

DONE this 29th day of October, 2014.

_____
United States District Judge